THE METROPOLITAN WEST SIDE ELEVATED RAILWAY COMPANY, Appellee, *vs.* CITY OF CHICAGO, Appellant.—THE NORTHWESTERN ELEVATED RAILROAD COMPANY, Appellee, *vs.* CITY OF CHICAGO, Appellant.—THE SOUTH SIDE ELEVATED RAILROAD COMPANY, Appellee, *vs.* CITY OF CHICAGO, Appellant.

*Opinion filed February 21, 1914.*

1. MUNICIPAL CORPORATIONS—*city has no legislative power not expressly or impliedly given by legislature.* All legislative power is vested in the General Assembly, and while it may delegate power to municipal corporations to legislate concerning local matters, such power will be regarded as delegated only where it is given in express terms or is necessarily implied from powers expressly given, and a power not so delegated remains in the General Assembly and can be exercised by it alone.

2. SAME—*clause 42 of section 1 of article 5 of Cities and Villages act does not embrace all common carriers.* Clause 42 of section 1 of article 5 of the Cities and Villages act, authorizing cities to license, tax and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and to prescribe their compensation, does not include all common carriers.

3. SAME—*clause 42 of section 1 of article 5 of Cities and Villages act does not extend to railroads organized under Railroads act.* The fact that clause 42 of section 1 of article 5 of the Cities and Villages act has been held by the Supreme Court to include street railway companies organized under the general Incorporation law does not authorize a holding that it also includes elevated railroad companies organized under the Railroads act.

4. SAME—*General Assembly has not delegated power to fix compensation of railroad companies organized under the Railroads act.* The General Assembly has by section 24 of the Railroads act reserved to itself the power to establish rates and charges by corporations organized under such act, and the fact that such power has not been delegated to municipal corporations is shown by the passage of the act creating the railroad and warehouse commission and the act establishing the maximum passenger fare at two cents a mile for adult passengers.

5. RAILROADS—*elevated railroad of corporation organized under the Railroads act is not a street railway.* An elevated railroad of a corporation organized under the Railroads act is not a street rail-

way, notwithstanding the fact that the city, under its power to impose conditions upon the construction of such a railroad upon or across its streets, has limited the business of the corporation to carrying passengers. (*Knopf* v. *Lake Street Elevated Railroad Co.* 197 Ill. 212, followed.)

6. SAME—*corporation organized under Railroads act need not exercise all of its charter powers.* An elevated railroad corporation organized under the Railroads act may agree with a property owner or the city that it will engage only in carrying passengers or may otherwise limit itself in the use of its rights, but that fact does not change the character of the corporation and make it a street railway corporation.

7. SAME—*city has no power to require elevated railroad corporations organized under the Railroads act to exchange transfers.* A city has no power to pass an ordinance requiring elevated railroad corporations organized under the Railroads act to exchange transfers, so as to enable a passenger who has paid a five-cent fare to one of such corporations to obtain a continuous ride within the limits of the city over the lines of the other corporations whose lines adjoin, intersect or connect with the line on which the fare is paid.

APPEAL from the Circuit Court of Cook county; the Hon. JESSE A. BALDWIN, Judge, presiding.

WILLIAM H. SEXTON, Corporation Counsel, JOHN W. BECKWITH, and WILLIAM DILLON, (CHARLES M. HAFT, of counsel,) for appellant.

ISHAM, LINCOLN & BEALE, and HERRICK, ALLEN & MARTIN, (JOHN J. HERRICK, and GILBERT E. PORTER, of counsel,) for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The city of Chicago passed an ordinance providing that a passenger who pays one five-cent fare to any one of the corporations owning or operating elevated railroads in the city shall be entitled to receive a transfer from such corporation entitling him to ride for a continuous trip within the city, without any further payment of fare, upon the rail-

road of any other such corporation whose railroad connects, adjoins or intersects the railroad on which the payment is made. The Metropolitan West Side Elevated Railway Company, the Northwestern Elevated Railroad Company and the South Side Elevated Railroad Company, three of such corporations owning and operating elevated railroads, severally filed bills in the circuit court of Cook county against the city of Chicago to enjoin the enforcement of the ordinance, denying the power of the city to pass it. Answers and replications were filed and the evidence was heard by the chancellor, who found that the city was without authority to pass the ordinance and declared it void. The city appealed from the decrees and the causes have been consolidated.

Each of the railroad corporations was organized under the general Railroad act, providing for the creation of corporations to construct, maintain and operate railroads, and which authorizes such corporations to select the routes of their railroads, to exercise the power of eminent domain for acquiring the right of way over the routes selected and other property necessary for the corporate uses, and to construct their railroads upon the routes so selected. The Metropolitan West Side Elevated Railway Company has twenty-two miles of railroad, extending beyond the city of Chicago to other places and connects with other lines to and from cities in the State. Its railroad is constructed on its private right of way, acquired by purchase or condemnation, except about one-fifth of a mile which runs longitudinally on streets under grants from the city council. The Northwestern Elevated Railroad Company has nineteen miles of railroad, and, like the Metropolitan, extends to towns and cities outside of Chicago. Its railroad is on its private right of way, except about one and one-fifth miles where it runs longitudinally on streets by consent of the city. The South Side Elevated Railroad Company has sixteen miles of railroad, all of which is on its own private

right of way except about four and one-half miles con-
structed above streets and alleys with like consent of the
city.   The corporations run trains of from two to six cars,
carrying several hundred passengers on each train.   The
trains stop only at regular stations provided for receiving
and discharging passengers, who pay their fares or buy
tickets before getting on the trains.   Some of the stations
are near each other and others are at considerable distances,
some of them from two-thirds of a mile to a mile apart.
All of the corporations run both local and express trains,
and some of the trains run from four to six miles without
making any stop.

The question of the power of the city to pass the ordi-
nance does not involve any controversy as to the power
of regulation and control of the corporations or the fixing
of rates of fare.   That power is reserved to the General
Assembly by section 24 of the act under which the corpo-
rations are organized, which provides that the General As-
sembly may from time to time enact laws to establish rea-
sonable maximum rates and charges and to enforce their
observance by adequate penalties.   Neither is there any dis-
pute of the proposition that the General Assembly may
delegate to local authorities powers of regulation not in-
consistent with the general laws on the subject, nor that
the city may, under the delegation of the police power,
make reasonable regulations to conserve the public safety,
health and morals.   The only question concerning the au-
thority to pass the ordinance is whether the General As-
sembly has delegated to the city of Chicago the power to
pass it, and thereby fix a rate of five cents for a continuous
trip within the city over the different railroads upon the
payment of a five-cent fare to one of them.

All legislative power is vested in the General Assembly,
and while it may delegate power to local authorities to
legislate concerning local matters, the settled rule is that
such power will be regarded as delegated only where it is

given in express terms or is necessarily implied from powers expressly given. (*City of Chicago* v. *M. & M. Hotel Co.* 248 Ill. 264.) A power not so delegated remains with the General Assembly and can only be exercised by it. The authority of the city of Chicago, if it exists at all, is to be found in clause 42 of section 1, article 5, of the Cities and Villages act, which gives power "to license, tax and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and to prescribe their compensations," and which was enacted in 1872 and re-enacted in 1911. (Laws of 1911, p. 173.) Other powers enumerated in that section are referred to in argument by counsel for the city, but if the power is not conferred by clause 42 there is no substantial basis for the claim that it exists.

It was decided in *Chicago Union Traction Co.* v. *City of Chicago,* 199 Ill. 484, that a corporation organized under the general act for the creation of corporations for pecuniary profit and operating a street railway in the streets of the city of Chicago, carrying passengers for hire, was pursuing a like occupation with omnibus drivers, cabmen and hackmen and was subject to the power granted to the city by clause 42. That decision furnishes the basis for the argument on the part of the city, and its counsel contend that because the elevated railroads carry passengers from station to station within the city on their own right of way they are pursuing a like occupation with omnibus drivers, cabmen and hack drivers. In re-enacting section 1 in 1911 the legislature did not include street railways in terms, and used the same words as in 1872 to describe occupations which the street railways had practically supplanted, but it is to be presumed to have been intended that the section should be given the same meaning given it by this court, as including street railways. There is no inference, however, to be drawn from the re-enactment that the words used should have any broader scope than they originally

had when interpreted by this court. Counsel for the city ask us to give them a much broader meaning by including all common carriers because draymen, carters and expressmen are named in the clause. It is quite clear that it was not the intention of the General Assembly to give power to regulate all common carriers, because if it had been there would have been no reason for enumerating particular classes of carriers, and the provision would have been that the city might license, tax and regulate all common carriers and fix their compensation. There may be, and are, within the corporate limits of cities corporations organized under the general Railroad act as terminals for transferring cars or property from one road to another and for switching purposes, and it would be a great stretch of imagination to class them with draymen, carters or expressmen hauling loads of goods from place to place about the city. The rule is, that where general words follow an enumeration of particular things or classes of things the general words are limited to things or classes of the same general nature. And that all common carriers were not intended in clause 42 is also shown by the understanding of the General Assembly in the act establishing the railroad and warehouse commission, which expressly gives it jurisdiction over all common carriers within the State and authorizes it to establish reasonable rules and regulations concerning switching service, practically all of which is done within the cities and villages. (*Railroad and Warehouse Commission* v. *Vandalia Railroad Co.* 258 Ill. 397.) So far as the passenger business of corporations organized under the general Railroad act is concerned, the General Assembly itself has exercised its authority by laws applicable both within and without cities, and particularly with reference to passenger fares, fixing a maximum rate of two cents per mile for adult passengers. (Laws of 1907, p. 476.) This was an exercise of the power reserved by section 24 to fix maximum rates that could be charged on

any railroad constructed under the provisions of that act, and shows that the General Assembly reserved to itself the regulation of such corporations, except as municipalities might fix conditions for the crossing or occupation of streets by authority expressly given for that purpose.

It is further insisted that the elevated railroads of corporations organized under the Railroad law are street railways. Even if that term could properly be applied to them it would not be conclusive that in running their trains from station to station they pursue a like occupation with omnibus drivers, hackmen or cabmen. But they are not street railways. Those minor portions of elevated railroads located in streets have been spoken of in various cases as street railroads, but always with the meaning that they were railroads in streets, and it was decided in *Knopf* v. *Lake Street Elevated Railroad Co.* 197 Ill. 212, that an elevated railroad of a corporation organized under the general Railroad act is not a street railway. That was a case where the question was directly and necessarily involved and the decision was upon the precise question. In determining whether the elevated railroad corporations were subject to assessment by the State Board of Equalization it was held that they were not street railroad companies; that they were not incorporated or organized as such; that they were not confined, in constructing and operating their roads, to streets and highways, as street railroad companies were, except in case of necessary divergences for short distances; and that their railroads could not be classed as street railways nor the companies as street railway companies. That decision was based on settled principles. The law under which a corporation is organized enters into and forms a part of its charter. (*Chicago Union Traction Co.* v. *City of Chicago, supra; People* v. *Chicago Gas Trust Co.* 130 Ill. 268; *City of Danville* v. *Danville Water Co.* 178 id. 299.) The purposes for which a corporation is organized must be ascertained by reference to its charter. (*Distilling*

*and Cattle-Feeding Co.* v. *People,* 161 Ill. 101; *Evanston Electric Illuminating Co.* v. *Kochersperger,* 175 id. 26.) Street railway corporations organized under the Corporation act are confined to streets and highways, and their railways conform to the grade of the street and are intended to accommodate street traffic. They make frequent stops to take on and let off passengers and are without regular stations. (*Harvcy* v. *Aurora and Geneva Railway Co.* 174 Ill. 295; *Dewey* v. *Chicago and Milwaukee Electric Railway Co.* 184 id. 426; *Gillette* v. *Aurora Railways Co.* 228 id. 261; *Harvey* v. *Aurora and Geneva Railway Co.* 186 id. 283.) Corporations organized under the Railroad act select their own routes, establish their stations and construct their lines of railway, and, of course, the frequency of the stations or the length of the trip of each passenger does not determine the nature of the railroad. The city may permit the construction of such a railroad upon or across any street and impose such conditions as it may see fit, (*Byrne* v. *Chicago General Railway Co.* 169 Ill. 75; *Chicago Terminal Transfer Railroad Co.* v. *City of Chicago,* 220 id. 310;) as in the case of these roads, where the privilege was granted upon condition that the corporation should only carry on a passenger traffic. But that did not make the roads street railways. A corporation organized under the Railroad act may exercise only a part of its chartered powers. It may agree with a property owner that its road shall be used only for passenger traffic or otherwise limit itself in the use of its right of way. That was decided in the case of an elevated railroad where the corporation was organized under the Railroad law. (*Lieberman* v. *Chicago and South Side Rapid Transit Railroad Co.* 141 Ill. 140.) But such an agreement would not change the character of the corporation and make it a street railway corporation. All railroad companies run trains for passengers, only, and the duty to furnish such trains will be enforced by *mandamus.* (*People* v.

*St. Louis, Alton and Terre Haute Railroad Co.* 176 Ill. 512.) In running such trains from station to station within a city on their own right of way the companies do not pursue an occupation like that of hackmen or cabmen, who go anywhere about the city as directed, or omnibus drivers following regular routes and stopping to let off or take on passengers.

There have been a number of cases where abutting property owners sought to enjoin the construction of elevated railroads in the street, and much reliance is placed upon them by counsel for the city. In *Doane* v. *Lake Street Elevated Railroad Co.* 165 Ill. 510, the question was whether an abutting property owner could maintain a bill to enjoin the construction of an elevated railroad where the fee of the street was vested in the city and the city had authorized the construction of the road. It was held that he could not maintain such a bill where the construction did not subject the street to an unlawful use, and that would be so whether the railroad was a street railroad or a commercial railroad. Cities have a right to permit the construction of either in their streets upon prescribed conditions, and if the fee of the street is in the city no part of the property of an abutting property owner is taken, but he must await the construction of the road, and if he suffers damage for which the law and the constitution give a right of recovery he may then recover his damages. There have been other cases like the *Doane case,* but in *Aldis* v. *Union Elevated Railroad Co.* 203 Ill. 567, although it was held that the elevated railroad was not a diversion of the street from the public use and the fee was in the city, it was also held the abutting property owner might sue for damages, and the measure would be the same as though a condemnation suit had been brought. That was an action at law by an abutting property owner to recover damages to his property by the construction of an elevated railroad, and the court said that while the doctrine of the *Doane case* was that the con-

struction of the road with the consent of the municipality did not subject the street to an unlawful use, the abutting property owner might recover his damages. An abutting owner cannot recover damages to his property merely on account of the construction of a street railway in the street and the use of the street for its purposes, because it is only a changed method of travel for which a street was laid out and dedicated. He could not have recovered damages to his property for the use of the street by omnibus drivers, hackmen or cabmen, and the change in the method of use by corporations engaged in a like occupation, by means of cars running on rails, gives him no greater right. The decisions are all consistent with the established rule that where an abutting owner owns to the center of the street he may enjoin the use of the street by a corporation organized under the Railroad act until his damages are ascertained and paid, but if the fee of the street is in the city he cannot have such an injunction, and must bring his action at law after the construction of the road to recover his damages. On the contrary, in the case of street railways, which have largely taken the place of omnibuses, hacks and cabs, running on the streets to accommodate local passenger traffic, there is merely an adoption of a new method of travel and there can be no recovery.

We conclude that the General Assembly has not delegated to the city of Chicago authority to pass the ordinance in question, and therefore the decrees are affirmed.

*Decrees affirmed.*